IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| LINDSEY OAKS, et al., | : | Case No. 1:25-cv-93 |
| | : | |
| Plaintiffs, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| COLUMBUS RADIOLOGY CORP. et al., | : | |
| | : | |
| Defendants. | : | |

## ORDER AND OPINION

This matter is before the Court on Defendant Columbus Radiology Corporation's Motion to Dismiss Plaintiff's Complaint (Doc. 13). Plaintiff filed a Response in Opposition (Doc. 14), and Defendant filed a Reply in Support (Doc. 15). Thus, this matter is ripe for the Court's review. For the following reasons, the Court **GRANTS IN PART** Defendant's Motion to Dismiss (Doc. 13).

## ALLEGED FACTS

### I.    The Parties

Plaintiffs Lindsey Oaks, Gerald Jeffries, Constance Quigley, Emil Merolla, and Cynthia Merolla (collectively, "Named Plaintiffs") received care at Ohio hospitals and healthcare centers where Defendant Columbus Radiology Corporation ("CRC") provides radiological services. (Compl., Doc. 1, ¶¶ 4-9.) Defendant Frost-Arnett Company ("Frost-Arnett") provides debt collection and revenue cycle services to CRC. (*Id.* at ¶¶ 10, 13.)

CRC entered into Provider Agreements with Health Insuring Corporations ("HICs") that operate in Ohio. (Compl., Doc. 1, ¶ 17.) The Provider Agreements contain a "hold harmless" provision per Ohio Revised Code § 1751.13(C)(2). This provision states, in relevant part:

> "[Provider/Health Care Facility] agrees that in no event, including but not limited to nonpayment by the health insuring corporation [...], shall [Provider/Health Care Facility] bill, charge, collect a deposit from, seek remuneration or reimbursement from, or have any recourse against, a subscriber, enrollee, person to whom health care services have been provided, or person acting on behalf of the covered enrollee, for health care services provided pursuant to this agreement. This does not prohibit [Provider/Health Care Facility] from collecting co-insurance, deductibles, or copayments as specifically provided in the evidence of coverage, or fees for uncovered health care services delivered on a fee-for-service basis to persons referenced above, nor from any recourse against the health insuring corporation or its successor."

(*Id.* at ¶ 18.) Named Plaintiffs allege that Defendants CRC and Frost-Arnett "systematically failed and/or refused to submit claims for medical treatment" to patients' HICs and instead billed the patients directly, in violation of the Provider Agreements, O.R.C. §§ 1751.60, 3902.51, and 26 U.S.C. § 9816. (*Id.* at ¶ 19.)

## II. Allegations of the Named Plaintiffs

Plaintiff Oaks specifically alleges that, in 2023, she suffered injuries in a motor vehicle accident and received treatment, including an MRI scan of her spine, at Mercy Health – West Hospital in Cincinnati, Ohio. (Compl., Doc. 1, ¶¶ 20-21.) When she arrived at the hospital, she informed the registration clerk that she had health insurance coverage through Anthem BCBS, an HIC, and alleges that she provided all relevant information necessary to submit claims for coverage to that HIC, including plan name, claim address,

2

group number, and policy number. (*Id.* at ¶ 23; *see also* Oaks Intake Form, Exhibit 3, Doc. 1-4.) Mercy Health – West then forwarded that information to CRC, who performed the MRI at the hospital. (*Id.* at ¶¶ 24-25.) However, Plaintiff Oaks alleges that, in the following months, CRC sent numerous bills seeking payment directly from her; these payments were neither co-payments nor deductibles. (*Id.* at ¶ 26.) Specifically, CRC mailed requests for payment on October 18, 2023, November 27, 2023, January 6, 2024, and February 16, 2024. (*Id.* at ¶ 27; *see also* Oaks Mail, Exhibit 4, Doc. 1-5.) And, CRC emailed Plaintiff Oaks to request payment on November 10, 2023, November 29, 2023, and December 6, 2023. (*Id.* at ¶ 28; *see also* Oaks Email, Exhibit 5, Doc. 1-6.) Furthermore, CRC texted Plaintiff Oaks on December 6, 2023, to seek payment directly from her. (*Id.* at ¶ 29; *see also* Oaks CRC Text, Exhibit 6, Doc. 1-7.)

After these payment requests, CRC then turned the matter to Frost-Arnett, who sought payment directly from Plaintiff Oaks via text message on thirty separate occasions between January and December 2024. (Compl., Doc. 1, ¶¶ 30-31; *see also* Oaks Frost-Arnett Text, Exhibit 7, Doc. 1-8.) Frost-Arnett also called Plaintiff Oaks to seek direct payment starting June 5, 2024, through the filing of the Complaint. (*Id.* at ¶ 32; *see also* Oaks Frost-Arnett Telephone Record, Exhibit 8, Doc. 1-9.) Plaintiff Oaks alleges that Defendants have failed and refused to submit her medical claims to Anthem BCBS, her HIC. (*Id.* at ¶ 33.)

Plaintiff Jefferies experienced a similar set of circumstances with Defendants. (Compl., Doc. 1, ¶¶ 34-44.) After suffering injuries, he sought treatment at Mercy Health – Clermont Hospital and informed the registration clerk of his health insurance coverage through Medical Mutual. (*Id.* at ¶¶ 34-37.) He received radiological services at the

3

hospital from CRC, and his itemized medical bills confirm these services along with his insurance coverage through his HIC. (*Id.* at ¶¶ 38-39; *see also* Jefferies Medical Bills, Exhibit 9, Doc. 1-10.) In the months that followed, CRC sought payment for these services directly from Plaintiff Jefferies; when he did not pay, CRC directed Frost-Arnett to seek payment from him. (*Id.* at ¶¶ 41-42; *see also* Jefferies' CRC Request, Exhibit 10, Doc. 1-11; CRC Authorization to Frost-Arnett, Exhibit 11, Doc. 1-12; Jefferies' Frost-Arnett Request, Exhibit 12, Doc. 1-13.) Plaintiff Jefferies thus alleges that Defendants failed and refused to submit his medical claims to his HIC. (*Id.* at ¶ 44.)

Plaintiff Quigley similarly received treatment at a hospital where CRC provided her with radiological services. (Compl., Doc. 1, ¶¶ 45-46, 49.) She, too, informed the registration clerk of her health insurance coverage through Anthem BCBS. (*Id.* at ¶¶ 47-48.) And, again, itemized medical bills confirm her treatment from CRC along with her insurance coverage through her HIC. (*Id.* at ¶ 50; *see also* Quigley Medical Bills, Exhibit 13, Doc. 1-14.) But, just as with the other Named Plaintiffs, Plaintiff Quigley received a request for payment directly from CRC. (*Id.* at ¶ 52; Quigley CRC Request for Payment #1, Exhibit 14, Doc. 1-15.) In response to this request, Plaintiff Quigley directed her legal counsel to contact CRC, who advised CRC that Plaintiff Quigley had health insurance and provided CRC with a copy of that insurance card. (*Id.* at ¶ 53; *see also* Quigley's Counsel Letter, Exhibit 15, Doc. 1-16.) Despite this correspondence, CRC sent another letter seeking payment directly from Plaintiff Quigley for the medical services it provided. (*Id.* at ¶ 54; *see also* Quigley CRC Request for Payment #2, Exhibit 16, Doc. 1-17.)

4

Plaintiff E. Merolla's allegations are similar, yet the circumstances differ slightly from those of the other Named Plaintiffs. (*See* Compl., Doc. 1, ¶¶ 55-66.) Plaintiff E. Merolla received treatment at Southwest General Hospital in Cuyahoga County, Ohio in 2023. (*Id.* at ¶ 55.) He provided the registration clerk with his health insurance information through Medicare and Mutual of Omaha Medicare Supplement. (*Id.* at ¶ 57.) He then received radiological services from CRC while at the hospital; an itemized explanation of benefits ("EOB") confirms this treatment and lists his health insurance coverage through his HIC. (*Id.* at ¶¶ 58-59; *see also* E. Merolla Explanation of Benefits, Exhibit 17, Doc. 1-18.) CRC then sent Plaintiff E. Merolla correspondence seeking payment for the medical treatment directly. (*Id.* ¶ 61.) However, unlike the other Named Plaintiffs, Plaintiff E. Merolla paid the medical bill in full. (*Id.* at 62; *see also* E. Merolla Payment Confirmation, Exhibit 18, Doc. 1-19.) In the months that followed, though, Plaintiff E. Merolla realized that CRC had unlawfully billed him; so, he attempted to request a refund of his payment by contacting CRC, filing complaints with the Ohio Attorney General's Office, and the Centers for Medicare & Medicaid Services. (*Id.* at ¶ 63.)

In response to the refund request, CRC advised Plaintiff E. Merolla that he would receive a refund of the $200.00 he paid them. (Compl., Doc. 1, ¶ 64; *see also* E. Merolla CRC Refund Confirmation, Exhibit 19, Doc. 1-20.) Then, Novitas Solutions, an entity acting on behalf of the Centers for Medicare & Medicaid Services, sent a written correspondence to CRC, stating that "you collected $200.00 more than was due from Emil Merolla," and reminding CRC of potential civil penalties, administrative sanctions, and

criminal penalties for this violation. (*Id.* at ¶ 65; *see also* Novitas Letter, Exhibit 20, Doc. 1-21.) Despite this, CRC failed to refund Plaintiff E. Merolla's payment. (*Id.* at ¶ 66.)

Plaintiff C. Merolla's allegations differ slightly from the other Named Plaintiffs as well. (Compl., Doc. 1, ¶¶ 67-74.) She also received treatment from CRC at Southwest General Hospital, where she notified the registration clerk of her health insurance coverage through Medicare and Cigna Medicare Supplement. (*Id.* at ¶¶ 67-69.) Her itemized EOB confirms her treatment and her health insurance coverage through her HIC. (*Id.* at ¶ 71; C. Merolla Explanation of Benefits, Exhibit 21, Doc. 1-22.) The EOB, dated October 15, 2024, indicates that CRC sought payment from the HIC, and the HIC made payment to CRC at the reimbursement rate; the remaining "patient responsibility" was $0.00. (*Id.* at ¶ 73; *see also* C. Merolla Explanation of Benefits, Exhibit 21, Doc. 1-22.) Nevertheless, CRC sought payment directly from Plaintiff C. Merolla on October 31, 2024, despite the fact that her HIC had paid CRC in full. (*Id.* at ¶ 74.)

Named Plaintiffs thus allege that Defendants have intentionally refused, failed, and avoided submitting claims to patients' HIC in an effort to increase profits and force patients to pay more for medical services than would otherwise be paid by the HICs. (Compl., Doc. 1, ¶ 76.) This was done in violation of federal and Ohio law, as well as the Provider Agreements between CRC and the HICs. (*Id.* at ¶ 77.) Named Plaintiffs bring these allegations on behalf of themselves and others similarly situated. (*See id., generally.*) They define their proposed Class as all Ohio citizens who have received or will receive services from CRC, in a medical facility that contracts with the patients' HIC, who were or will be subjected to attempts to collect, or collection, by CRC and Frost-Arnett of any

amount other than co-payments or deductibles as required by the patients' health insurance contracts. (*Id.* at ¶ 79.)

## PROCEDURAL POSTURE

Named Plaintiffs brought this action against Defendants on February 14, 2025, on behalf of themselves and others similarly situated. (Compl., Doc. 1.) The Complaint contains six claims arising under either Ohio common law or federal statute. (*Id.*) The claims are: (1) tortious interference against both Defendants; (2) breach of third party beneficiary contract against CRC; (3) violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, against Frost-Arnett; (4) fraud against both Defendants; (5) conversion against both Defendants; and (6) unjust enrichment against both Defendants. (*Id.* at ¶¶ 89-119.) On May 6, 2025, Frost-Arnett filed its Answer to Plaintiff's Complaint (Doc. 12), while CRC filed a Motion to Dismiss Plaintiff's Complaint (Doc. 13). The Motion has been fully briefed (*see* Docs. 14, 15) and is now ripe for the Court's review.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss for failure to state a claim tests a plaintiff's cause of action as stated in a complaint. *Golden v. City of Columbus*, 404 F.3d 950, 958 (6th Cir. 2005); Fed. R. Civ. P. 12(b)(6). A claim for relief must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Courts accept all factual allegations as true and construe them in the light most favorable to the plaintiff. *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018). That said, courts are not bound to do the same for a complaint's legal conclusions. *Twombly*, 550 U.S. at 555. And, when a complaint

7

contains sufficient facts to satisfy the elements of an affirmative defense put forth by a defendant, courts may grant dismissal on that basis. *Est. of Barney v. PNC Bank, Nat. Ass'n,* 714 F.3d 920, 926 (6th Cir. 2013).

Meanwhile, Rule 9(b) requires a higher standard for a plaintiff who alleges fraud in the complaint. Fed. R. Civ. P. 9(b). In alleging fraud, a plaintiff must state "with particularity the circumstances constituting fraud." *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir. 1988). This higher standard, however, "does not require omniscience," but rather "requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Id.* at 680. This is especially true when "there has been no discovery," and the facts underlying the claims of fraud "are within the defendant's control." *Id.*

## ANALYSIS

### I. CRC's Oral Argument Request

Before beginning its analysis, the Court must first address the need for oral argument. In its Motion, CRC requested oral argument, pursuant to the Local Rules of this Court. (Motion, Doc. 13, Pg. ID 183; *see also* S.D. Ohio Civ. R. 7.1(b)(2).) Local Rule 7.1(b)(2) provides for oral argument when it is "deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented." S.D. Ohio Civ. R. 7.1(b)(2). However, whether to grant a request for oral argument "is left to the sound discretion of the trial court." *Ohio ex rel. Dann v. Citibank (South Dakota), N.A.,* No. , 2008 WL 1990363, at *6 (S.D. Ohio May 1, 2008). Having reviewed the briefing and issues presented by the parties, the Court does not find that

the case presents factual or legal issues of significant complexity or public importance. *Id.* Accordingly, oral argument is not essential here, and CRC's request is denied.

## II. Materials Incorporated into Defendant's Motion

In its Motion, CRC attached the Declaration of Bebe Valencia, a client relations partner who works with CRC, along with accompanying exhibits that show CRC's billing and insurance summaries for the Named Plaintiffs. (*See* Valencia Decl., Doc. 13-2; Exhibits, Docs. 13-3 - 13-14.) Named Plaintiffs object to the use of these documents as they fall outside of the pleadings. (Response, Doc. 14, Pg. ID 246.) Accordingly, as a preliminary matter, the Court must determine whether it can consider these external documents in ruling on CRC's Motion. After this determination, the Court will proceed to the merits of the Motion.

Generally, as Named Plaintiffs point out, a court can only consider the materials which are properly before it when deciding on a motion to dismiss. (Response, Doc. 14, Pg. ID 246-47; *see also Diei v. Boyd*, 116 F.4th 637, 643 (6th Cir. 2024)). "[A] Rule 12(b)(6) motion should be decided solely on the complaint." *Diei*, 116 F.4th at 643. But, there is an exception to this general rule: a court may review "exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Id.* (cleaned up). When determining whether the documents are central to the Complaint's claims, "it must also be clear that there exists no material disputed issues of fact regarding the relevance of the documents." *Id.* at 644 (quotation omitted). Further, "a district court should not rely on documents at the motion-to-dismiss stage if their authenticity is disputed." *Moyer v. Gov't Emp. Ins. Co.*, 114 F.4th 563, 568 (6th

9

Cir. 2024).

CRC asserts that the materials it presents with its Motion are "referenced in and essential to the Complaint." (Motion Memo, Doc. 13-1, Pg. ID 194.) As CRC argues, Named Plaintiffs "squarely reference and put at issue CRC's billing for their medical services rendered and the insurance information that they provided to the clients CRC services," and so, CRC's billing and insurance summaries are central to the claims. (*Id.*) Further, CRC states that the authenticity of these summaries cannot be disputed because they are "kept in the regular course of business and reflect contemporaneous transcripts of the information received from the hospital system." (*Id.*) Named Plaintiffs, however, disagree. (Response, Doc. 14, Pg. ID 246-47.) First, Named Plaintiffs point out that Valencia is not an employee of CRC but instead works in a third-party "customer service" role at another company that is not identified in her declaration. (*Id.* at Pg. ID 247.) In other words, CRC "is relying on the declaration of a third-party witness" whom they have not deposed. (*Id.*) And, regarding the authenticity of the records, Named Plaintiffs argue that the declaration fails to articulate how Valencia, who is not a CRC employee, "could be a custodian or otherwise qualified to testify relative to the creation and accuracy of the attached records." (*Id.*) CRC responds by stating that Named Plaintiffs do not dispute that the declaration and accompanying exhibits are referenced in and central to its claims. (Reply, Doc. 15, Pg. ID 261.) Instead, they only focus on Valencia's lack of employment with CRC as evidence of her inability to authenticate the documents. (*Id.*) And, to this end, CRC points out that Named Plaintiffs have not cited any case law to support the contention that a non-employee cannot authenticate business records. (*Id.*)

10

Nevertheless, whether the Court can consider these documents is a threshold matter, and the Court may only examine the declaration and exhibits if they are referred to in the Complaint and central to the claims. *See Diei*, 116 F.4th at 643. Accordingly, the Court conducts its own analysis. The exhibits show the "insurance history" and "account charges" in CRC's system from each Named Plaintiff. (Exhibits to Motion, Docs. 13-3 – 13-14.) The Court agrees that CRC's records of insurance history and account charges are integral to Named Plaintiffs' claims that CRC ignored their insurance and charged them directly. However, the Court does not agree that these documents are referred to anywhere in the Complaint. While the Complaint indicates that the hospitals "forwarded [...] HIC information," to CRC and that CRC "utilized demographic information provided by" the Named Plaintiffs to send them medical bills, neither of these statements directly reference the account and insurance summaries that CRC attempts to attach to its Motion. And, regarding the declaration, the Named Plaintiffs are correct to question the authenticity of it. Valencia, in referring to the exhibits, states that the Named Plaintiffs provided auto insurance policies, or failed to provide a policy, and did not provide health insurance policies to CRC, which is why they, and not their HICs, were billed. (*See* Valencia Decl., Doc. 13-2.) But, these are "statements beyond authentication, including factual allegations directly contrary to certain complaint allegations." *Hacker v. Arcelormittal Tubular Prods. USA LLC*, No. 1:24-CV-341, 2025 WL 918482, at *3 (N.D. Ohio Mar. 25, 2025) (citing *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010)). Accordingly, the Court cannot consider them at this stage of litigation. *Id.* Thus, the Court will not consider either the declaration or attached exhibits as it analyzes CRC's Motion

11

to Dismiss.

### III.   Merits of Defendant's Motion

Defendant's Motion outlines four claim categories: (1) general violation of Ohio Revised Code § 1751.60; (2) claims of conversion and unjust enrichment; (3) claims of tortious interference and breach of third-party beneficiary contract; and (4) a claim of common-law fraud. (Motion Memo, Doc. 13-1, Pg. ID 195-202.) Accordingly, the Court's analysis will address each category in turn.

#### a.  State and Federal Statutory Basis for Claims

While Named Plaintiffs do not bring a claim based on section 1751.60, they agree with CRC's contention that their claims against CRC implicate the statute. (Response, Doc. 14, Pg. ID 249.) To this end, CRC points out that Ohio courts have interpreted claims sounding in section 1751.60 violations by utilizing "the enforcement mechanism built into the statute rather than interpreting such claims through separate common law causes of action." (Motion Memo, Doc. 13-1, Pg. ID 195 (citing *King v. ProMedica Health Sys., Inc.*, 955 N.E.2d 348, 350 (Ohio 2011)).) So, according to CRC, Plaintiffs' five causes of action against CRC "all come down to whether they have plausibly pled all the elements necessary to show a violation" of section 1751.60. (*Id.* at Pg. ID 196.) Section 1751.60 provides that no health care provider that contracts with an HIC can seek compensation for covered services from an HIC's enrollees or subscribers; nor is any enrollee or subscriber liable to a provider for the cost of any covered service. O.R.C. §§ 1751.60(A), (B).

CRC contends that Ohio courts hold that providers are prohibited from seeking

12

compensation only in instances where: "(1) there is a contract between the health provider and insurer; (2) that the patient has put the provider on notice of; (3) which covers the services rendered; and (4) the health care provider has actually collected medical costs for the services rendered from the patient in question." (Motion Memo, Doc. 13-1, Pg. ID 196-97 (collecting cases).) As four of the five Named Plaintiffs alleged that CRC did not actually collect medical costs from them, CRC states that section 1751.60 does not provide relief for them; thus, CRC argues that these four Named Plaintiffs have failed to plausibly allege a claim. (*Id.* at Pg. ID 197.) And, regarding Plaintiff E. Merolla, CRC relies on Valencia's declaration and the exhibits to show that he failed to provide insurance information to CRC as required by the second element, which also warrants dismissal of his claims. (*Id.* at Pg. ID 198-99.) Accordingly, CRC states that all of Named Plaintiffs' claims against it should be dismissed as Named Plaintiffs cannot show that CRC violated section 1751.60. Before analyzing the Response, though, the Court first notes that CRC's contention about E. Merolla improperly relies on statements in the Valencia declaration; the Court will not consider these statements and instead finds that the Complaint alleged that E. Merolla, and all Named Plaintiffs, provided their health insurance information as required. (*See* Compl., Doc. 1, ¶¶ 23-24, 37, 40, 48, 51, 57, 60, 69, 72.) And, the Court notes that CRC does not dispute any other element of a section 1751.60 claim for any of the remaining Named Plaintiffs. The discussion thus centers on whether Named Plaintiffs need to allege that they paid their medical bills to CRC.

In response, Named Plaintiffs argue that CRC has misstated case law regarding claims under section 1751.60. (Response, Doc. 14, Pg. ID 249.) According to Named

13

Plaintiffs, the Sixth Circuit has held that the statute's prohibition on seeking compensation applies when "a health-care services contract is in place between a provider and a health-insuring corporation and the provider seeks payment from a health-insuring corporation's insured." (*Id.* (quoting *Raymond, et al. v. Avectus Healthcare, et al.*, 859 F.3d 381, 384 (6th Cir. 2017)).) Indeed, the "plain language of the statute prohibits [healthcare providers] from seeking compensation from the enrollees or subscribers." (*Id.* (quoting *Jackson v. Pro. Radiology, et al.*, 864 F.3d 463 (6th Cir. 2017)).) Thus, Named Plaintiffs argue that the Complaint does plausibly state claims that show a violation of section 1751.60. (*Id.*)

In its Reply, though, CRC distinguishes the cases Named Plaintiffs present. (Reply, Doc. 15, Pg. ID 260-61.) First, CRC states that *Raymond* involved a healthcare provider placing a hold on tort settlement funds, where the Sixth Circuit decided that such a hold constituted a collection of medical costs from the plaintiffs. (*Id.* (citing *Raymond*, 859 F.3d at 382).) And, *Jackson* is similarly distinguishable because the plaintiff in that case informed the medical provider of her insurance and made payments to the provider, which four of the five Named Plaintiffs did not do. (*Id.* (citing *Jackson*, 864 F.3d at 465).) The Court agrees that these cases are not quite on point, but finds still that each reiterates that section 1751.60 requires only the healthcare provider to "seek compensation," and not that the patient need actually pay the medical bill; both cases are silent on a requirement that the plaintiff have actually paid the bills. *See Raymond*, 859 F.3d at 386 ("The Ohio Supreme Court has narrowly interpreted Ohio Revised Code § 1751.60 to apply only when a health-care services contract is in place between a provider and a

14

health-insuring corporation and the provider seeks payment from a health-insuring corporations' insured," which is "precisely what [defendants] sought to do in this case.") (cleaned up); *Jackson*, 864 F.3d at 467 ("the plain language of Ohio Rev. Code § 1751.60(A) directly prohibits this type of direct billing" and if the provider "sought payment directly from [plaintiff] for medical benefits […] this is a direct violation of Ohio Rev. Code § 1751.60(A)").

Meanwhile, the case that CRC cites to support its contention that the Named Plaintiffs need to have paid the medical bills for their claims to survive is inapposite. *See Carter v. Chidlren's Emergency Servs. Inc.*, No 28454, 2020 WL 748201, at *4 (Ohio App. Ct. Feb. 14, 2020). *Carter*, which was an appellate review of summary judgment, first found that "there was no evidence that [the provider] sought to collect money from any of the plaintiffs." 2020 WL 748201, at *5. The court further held that "[d]amages is an essential element of the plaintiffs' R.C. § 1751.60 claims." 2020 WL 748201, at *4. The court found that, "[a]ssuming that the defendants did violate the statute, the plaintiffs could only prevail if they showed that they suffered compensable harm." *Id.* Yet, none of the plaintiffs could point to compensable damages, such as impact to their credit score, which was fatal to their claims at the summary judgment stage. *Id.* at *5. But, again, the case is silent as to a requirement that the plaintiffs need to have paid the medical bills; rather, the case merely states that, to survive summary judgment, no genuine issue of material fact can exist as to whether the plaintiffs suffered compensable damages from the defendants' violation of the statute. *Id.* Here, though, at the motion-to-dismiss stage, the parties have not engaged in discovery to ascertain whether a dispute of material fact

15

exists as to compensable damages caused by CRC's alleged conduct. And, in the Complaint, Named Plaintiffs allege that they indeed suffered damages because of this conduct. (Compl., Doc. 1, ¶¶ 76, 93, 98, 109, 112.) Viewing these allegations as true, along with the claims that they provided their insurance information and CRC still sought payment from them directly, the Court finds that Named Plaintiffs have plausibly alleged violations of section 1751.60.

Additionally, Named Plaintiffs point out that the Complaint alleges violations of the Federal No Surprises Act, 26 U.S.C. § 9816, a claim which CRC failed to address in its Motion. (Response, Doc. 14, Pg. ID 250; *see also* Compl., Doc. 1, ¶¶ 19, 75, 82.) CRC, though, is correct that the No Surprises Act does not create a private right of action, nor does the Ohio No Surprises Act, Ohio Revised Code § 3902.51, which is also mentioned in the Complaint (*see* Compl., Doc. 1, ¶¶ 19, 75, 82). (Reply, Doc. 15, Pg. ID 263.) Rather, CRC notes that it interpreted Named Plaintiff's Complaint and concluded that "each of the five claims against it sound in alleged violations of Section 1751.60," leading it to rely on that code section in addressing the various claims. (*Id.*)

Nevertheless, CRC contends that Named Plaintiffs cannot claim surprise that CRC sent them medical bills when they failed to provide "adequate health insurance information." (*Id.* at Pg. ID 264.) However, the Court points out that this assertion relies on statements only found in the Valencia Declaration, which the Court has already determined cannot be considered at this stage of litigation. Similarly, CRC states that Named Plaintiffs attempt to place the burden on the healthcare providers to obtain the requisite health insurance information, which neither the state nor federal No Surprises

16

Act supports, as the Named Plaintiffs should provide that information. (*Id.*) Yet, again, this claim relies on the Valencia Declaration's assertion that Named Plaintiffs failed to provide CRC with their health insurance information; meanwhile, the Complaint alleges that Named Plaintiffs did provide their health insurance information to CRC. (*See* Compl., Doc. 1, ¶¶ 23-24, 37, 40, 48, 51, 57, 60, 69, 72.) Accordingly, to the extent that the Named Plaintiffs attempt to assert a private right of action under either of the No Surprises Act, the Court agrees that those acts do not provide such a right. However, to the extent that CRC argues for dismissal of the common-law claims that sound in these acts using statements made in the Valencia Declaration, the Court declines to accept these arguments, as the declaration is not properly before the Court at this time. Thus, Named Plaintiffs plausibly assert claims grounded in these state and federal statutes.

### b. Derivative Causes of Action

Having established that Named Plaintiffs have stated claims that are supported by Ohio and federal statutes, the Court's analysis moves on to the individual causes of action against CRC: (1) tortious interference, (2) breach of third-party beneficiary contract, (3) common-law fraud, (4) conversion, and (5) unjust enrichment. As mentioned above, CRC divides these claims into three subcategories, which the Court will analyze in turn.

### i. Conversion and Unjust Enrichment (Counts 5 and 6)

CRC argues that Named Plaintiffs' claims for conversion and unjust enrichment must be dismissed because they "did not sustain any injury and because CRC properly billed them for the medical services provided." (Motion Memo, Doc. 13-1, Pg. ID 199.) Regarding conversion, CRC states that Ohio courts define the cause of action as "the

17

wrongful exercise of dominion over property to the exclusion of the rights of the owner or the withholding of the property from the owner's possession under a claim inconsistent with the owner's rights." (*Id.* (quoting *Bunta v. Superior VacuPress, L.L.C.*, 218 N.E.3d 838, 844-45 (Ohio 2022)).) To that end, CRC asserts that, since four of the Named Plaintiffs failed to pay any medical bills to CRC, their property has not been converted; and for Plaintiff E. Merolla, because he did not provide CRC with the proper insurance information, CRC had no choice but to bill him. (*Id.*) Named Plaintiffs fail to address this argument, a deficiency CRC notes in its Reply. (*See* Doc. 15, Pg. ID 266.) As a result, the Court finds that Named Plaintiffs have abandoned their conversion claim; dismissal of this claim is thus proper. *See Scott v. State of Tenn.*, 878 F.2d 382 (6th Cir. 1989) ("[I]f a plaintiff fails to respond or to otherwise oppose a defendant's motion, then the district court may deem the plaintiff to have waived opposition to the motion."); *Moody v. CitiMortgage, Inc.*, 32 F. Supp. 3d 869, 875 (W.D. Mich. 2014) (dismissing claims on motion from defendants where plaintiff failed to respond to the motion).

On the unjust enrichment claim, CRC states that Named Plaintiffs must demonstrate: "(1) a benefit was conferred upon the recipient; (2) the recipient had knowledge of the benefit; and (3) circumstances render it unjust or inequitable to permit the recipient to retain the benefit without compensating the party who conferred the benefit." (Motion Memo, Doc. 13-1, Pg. ID 199 (quoting *Parmatown Spinal & Rehab. Ctr., Inc. v. Lewis, et al.*, No. 81996, 2003 WL 22208786 (Ohio App. Ct. Sept. 25, 2003)).) Again, as with the conversion claim, CRC contends that because Named Plaintiffs either failed to allege that they paid anything to CRC or failed to provide proper insurance

18

information to CRC, their unjust enrichment claim should be dismissed. (*Id.* at Pg. ID 200.) However, in response, Named Plaintiffs argue that Ohio courts have illustrated "class entitlement to a return of funds unlawfully obtained and withheld by CRC." (Response, Doc. 14, Pg. ID 253.) Looking at the elements of the claim, Named Plaintiffs point out that the Complaint clearly alleges that "CRC has unlawfully retained money from plaintiffs and putative class members in violation of statutory law and applicable health insuring agreements." (*Id.* at Pg. ID 253-54.)

CRC's Reply, though, argues that Named Plaintiffs have offered only "conclusory statements" in response to its Motion. (Reply, Doc. 15, Pg. ID 266.) According to CRC, such statements are "insufficient as a matter of law to survive a motion to dismiss," adding that *Carter* requires plaintiffs to plausibly allege that they actually paid medical costs to the provider to sustain a cause of action. (*Id.* at Pg. ID 266-67 (citing *Carter*, 2020 WL 748201, at *4).) However, the Court finds this argument unpersuasive for two reasons. First, as noted above, the *Carter* holding does not require that plaintiffs have actually paid medical bills for a Section 1751.60 claim, but instead that plaintiffs suffered compensable damages. And, at this point, Named Plaintiffs have alleged that they suffered compensable damages; specifically, Plaintiff E. Merolla paid his bill, discovered such payment was incorrect, and has not received a refund from CRC. (Compl., Doc. 1, ¶¶ 62-66, 76, 93, 98, 109, 112, 116-19.) Second, the Complaint does more than make conclusory statements; it specifically alleges conduct that, taken as true, constitutes a violation of Section 1751.60, and, consequently, unjust enrichment on the part of CRC for Plaintiff E. Merolla and putative class members who wrongly paid medical bills and have not

19

received a refund. (*See* Compl., Doc. 1, ¶¶ 117-79.)

### ii.     Tortious Interference and Breach of Third-Party Beneficiary Contract (Counts 1 and 2)

CRC next argues that Named Plaintiffs' tortious interference and breach of third-party beneficiary claims fail. (Motion Memo, Doc. 13-1, Pg. ID 200.) For a tortious interference claim, CRC states that Named Plaintiffs must show: (1) a business relationship or contract; (2) the wrongdoer's knowledge of the relationship or contract; (3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages. (*Id.* (citing *Brookeside Ambulance, Inc. v. Walker Ambulance Serv.*, 678 N.E.2d 248, 252 (Ohio App. Ct. 1996)).) CRC asserts, however, that the Complaint fails to plead a specific contractual relationship with their insurers, CRC's knowledge of those contracts, any way that CRC caused the Plaintiffs or their insurers to break that contract, or any resulting damages. (*Id.*) In their Response, Plaintiffs fail to address CRC's arguments against their tortious interference claim. (*See* Response, Doc. 14, Pg. ID 254-56.) Accordingly, this claim is dismissed. *See Scott v. State of Tenn.*, 878 F.2d at 382; *Moody v. CitiMortgage, Inc.*, 32 F. Supp. 3d at 875.

Regarding the breach of third-party beneficiary contract claim, CRC states that Named Plaintiffs "would also have to plead compensable damages (which they cannot) and facts showing that they were intended beneficiaries under the applicable provider agreements, as demonstrated by the terms of the agreement." (Motion Memo, Doc. 13-1, Pg. ID 200 (citing *Huff v. FirstEnergy Corp.*, 957 N.E.2d 3, 7 (Ohio 2011)).) But, according

20

to CRC, Named Plaintiffs fail to identify any specific agreements between their HICs and CRC covering the services rendered, and do not allege that the agreements disclosed them specifically as beneficiaries. (*Id.* at Pg. ID 200-01.)

In response, Named Plaintiffs reiterate that the Complaint alleges they are third-party beneficiaries of health-insuring contracts between CRC and their HICs. (Response, Doc. 14, Pg. ID 254.) These contracts between CRC and the HICs constitute an agreement that CRC will provide medical services to Named Plaintiffs at a specific rate agreed upon between the parties. (*Id.*) While Named Plaintiffs acknowledge that they have not provided those contracts to the Court, they point out that Ohio Revised Code §§ 1751.60(a)-(e) and 1751.13(C)(2) require that every health insurer/health provider contract contain a "hold harmless" provision. (*Id.* at Pg. ID 254-55.) This provision, which must be restated verbatim in these contracts, states that the provider "agrees that in no event [...] shall [provider] bill, charge, collect a deposit from, seek remuneration or reimbursement from, or have any recourse against, a subscriber, enrollee, person to whom health care services have been provided, or person acting on behalf of the covered enrollee, for health care services provided pursuant to the agreement." (*Id.* at Pg. ID 255 (quoting O.R.C. § 1751.13(C)(2)).) Thus, since this statutory language is mandatory in every contract between an HIC and a health care provider, any contract that CRC had with Named Plaintiffs' HICs contained that provision. (*Id.* at Pg. ID 256.) And, every time CRC sought payment directly from a plaintiff, there was a breach of that contract to which the plaintiff was a third-party beneficiary. (*Id.*)

CRC, in its Reply, argues that Named Plaintiffs have still failed to address

21

cognizable damages and have not shown that it knew Plaintiffs were third-party beneficiaries of such contracts "absent Plaintiffs disclosing coverage at the time of services rendered." (Reply, Doc. 15, Pg. ID 267.) Yet, the Court is not convinced by this argument. First, as discussed, Named Plaintiffs did allege that they suffered damages. (*See* Compl., Doc. 1, ¶¶ 62-66, 76, 93, 98, 109, 112, 116-19.) And, CRC's contention that it was unaware of Named Plaintiffs' status as third-party beneficiaries to its contracts with HICs hinges on the Valencia declaration's assertion that Named Plaintiffs failed to disclose their insurance coverage at the time they received treatment. In actuality, Named Plaintiffs allege in their Complaint that they did, in fact, provide their insurance coverage information to the health care facility, who in turn, sent that to CRC. (*See* Compl., Doc. 1, ¶¶ 23-24, 37, 40, 48, 51, 57, 60, 69, 72.) Examining the Complaint and viewing these factual allegations as true, Named Plaintiffs have plausibly alleged each element of a breach of third-party beneficiary contract claim. (*See* Compl., Doc. 1, ¶¶ 95-98.) Dismissal of this claim is not warranted.

### iii.    Common-Law Fraud (Count 4)

Finally, CRC argues for dismissal of the common-law fraud cause of action. (Motion Memo, Doc. 13-1, Pg. ID 201.) CRC states that this claim fails for three separate reasons. (*Id.*) First, the Complaint does not allege the six required elements of a prima facie fraud claim: (1) a representation, or where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5)

justifiable reliance on the representation or concealment, and (6) an injury proximately caused by that reliance. (*Id.* (citing *Lasmer Indus., Inc. v. AM Gen., LLC,* 741 F. Supp. 2d 829, 839-40 (S.D. Ohio 2010)).) CRC claims that the Complaint does not allege any false statements it made or that CRC knew any statements it made were false or misleading; rather, CRC maintains that it relied on the insurance information Named Plaintiffs provided. (*Id.*) And, CRC reiterates that Plaintiffs have not alleged any injury or justifiable reliance resulting from fraud. (*Id.*)

In their Response, Named Plaintiffs point out that the Ohio Supreme Court has held that "a representation which will serve as the basis for an action in common-law fraud is not confined to spoken or written words but may encompass conduct that amounts to an assertion not in accordance with the truth." (Response, Doc. 14, Pg. ID 257-58 (citing *Russ v. TRW Inc.,* 59 Ohio St.3d 42 (1991)).) CRC replies that this Response merely "invite[s] the Court to parse through exhibits to the Complaint," to find that its conduct was systematic in defrauding Ohio patients. (Reply, Doc. 15, Pg. ID 268.) Reviewing the Complaint, though, the Court finds that Named Plaintiffs allege the elements of a common-law fraud claim, noting that the statement in question was CRC's actions taken to collect payment for its medical services and failure to seek those payments from the HICs. (*See* Compl., Doc. 1, ¶¶ 104-12.) These actions caused Named Plaintiffs, including Plaintiff E. Merolla, to believe they needed to pay those bills; as a result, Named Plaintiffs who paid bills unnecessarily suffered damages and have not been refunded. (*Id.* at ¶¶ 55-66, 104-12.) Accordingly, the Court finds that the Complaint alleges the elements of common-law fraud.

However, the analysis does not end here. CRC also argues for dismissal on the basis that the Complaint fails to allege fraud with particularity, as required by Federal Rule of Civil Procedure 9(b). (Motion Memo, Doc. 13-1, Pg. ID 202.) Specifically, CRC states that Named Plaintiffs "fail to allege any systemic billing practice on the part of CRC affecting" them and the proposed class members, or "put CRC on sufficient notice of its alleged misconduct." (*Id.*) Named Plaintiffs disagree, stating that the factual allegations in the Complaint, and the exhibits attached, "amply illustrate that CRC's conduct was systematic in defrauding Ohio patients resulting in the payment of money not owed." (Response, Doc. 14, Pg. ID 257.) The Complaint indeed specifically alleges that, "[Defendants] have intentionally and systematically refused, failed, and/or avoided submitting claims to patients' health insuring corporations in an effort to increase profits and force patients, including plaintiffs, to pay more for medical services than would otherwise be paid by the patients' HIC." (*See* Compl., Doc.1, ¶ 76.) And, despite CRC's contention that this Response asks the Court to "parse through exhibits," the Response cites specifically to Exhibit 23 of the Complaint, which provides the formal complaints to the Ohio Attorney General submitted by fifteen different patients regarding CRC's allegedly fraudulent billing practices that induced them to improperly pay CRC for medical bills. (*See* Ohio Attorney General Complaint, Exhibit 23, Doc. 1-24.)

The Court finds that, given the allegations and attached exhibits, the Complaint alleges fraud with particularity sufficient to meet Rule 9(b)'s requirements and overcome CRC's Motion. To this point, the Sixth Circuit has made clear that Rule 9(b) "requires that the plaintiff specify the who, what, when, where, and how of the alleged fraud." *Greer v.*

24

*Strange Honey Farm, LLC*, 114 F.4th 605, 614 (6th Cir. 2024) (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)). "More specifically, the complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at Pg. ID 615 (quoting *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 411 (6th Cir. 2022)) (cleaned up). And, the complaint "must describe the fraudulent scheme and resulting injury." *Id.* (quoting *New London Tobacco*, 44 F.4th at 411) (cleaned up). In other words, the allegations must put the defendant on notice as to the nature of the claim. *Id.* Here, the Complaint describes CRC's billing practices that allegedly violate Ohio law and cause patients, including Named Plaintiffs, to believe they owe CRC money that they, in fact, do not owe. (Compl., Doc. 1, ¶¶ 76-78, 104-12.) And, the Complaint lists the dates and manner by which CRC, through its agents, requested payments from the Named Plaintiffs, along with the descriptions of patients' similar experiences through the Ohio Attorney General complaints. (*Id.* at ¶¶ 27-29, 40-42, 51-54, 61-66, 74; *see also* Ohio Attorney General Complaints, Ex. 23, Doc. 1-24.) Thus, Named Plaintiffs have alleged with the requisite specificity a claim for common-law fraud.

Yet, CRC still argues that the fraud claim must be dismissed because it "overlaps with the tortious interference claim," and "[c]laims for tortious interference with contract in the form of a false representation cannot be converted into a claim for fraud where the alleged false representation was simply the means used to achieve the interference." (Motion Memo, Doc. 13-1, Pg. ID 202 (quoting *Lasmer Indus.*, 741 F. Supp. 2d at 839-40)

25

(cleaned up)).) But, the Court finds that this argument misstates the holding in *Lasmer*. In *Lasmer*, the plaintiff's tortious interference claim was time-barred; so, the plaintiff attempted to convert the tortious interference claim to a fraud claim. 741 F. Supp. 2d at 838. However, the court found that the claim was not "grounded in fraud," as the plaintiff argued, because "the alleged false misrepresentation was simply the means used to achieve the interference," not an element of the claim. *Id.* In fact, the court even noted that the plaintiff "has also asserted a fraud claim […] which is not barred by that [statute of] limitations provision." *Id.* That fraud claim was then dismissed for failure to plead with particularity. *Id.* at 839-40. Thus, CRC's argument is unconvincing. The dismissal of the tortious interference claim has no bearing on the fraud claim, which shall proceed.

### c. Class Treatment

Finally, CRC asserts that Named Plaintiffs "seek to advance an impermissible fail-safe class to which they would not be class members." (Motion Memo, Doc. 13-1, Pg. ID 202.) Accordingly, CRC calls for their class allegations to be dismissed or stricken. (*Id.*) In support of this argument, CRC states that the proposed class would require "mini-trials" of the Court to determine whether an individual should properly be considered a class member. (*Id.*) CRC points to *Kissling v. Ohio Casualty Insurance Co.*, No. 5:10-CV-22, 2010 WL 1978862 (E.D. Ky. May 14, 2010), where the court dismissed a complaint's class allegations because the class definition "require[d] a determination on the merits before a member can be identified." (*Id.*; 2010 WL 1978862, at *2.) Specifically, the proposed class included any insured plaintiffs who, within the past five years, suffered a loss covered by their policy with the defendant, provided defendant notice of the loss, and proof of

26

claim, and who received a claim payment but not the 12% interest on the settlement, and defendant did not attempt to settle their claim within 30 days of notice and proof. *Kissling*, 2010 WL 1978862, at *1. The court found that such a class would require a "mini-hearing" on whether: (1) the putative class member provided notice and proof of the claim as required under the terms of the policy; (2) the defendant failed to make a good-faith attempt to settle the claim within 30 days; and (3) the defendant failed to pay the interest. *Id.* at *2. In short, the court dismissed the class allegations because "class membership [was] also determinative of liability," and "such a fail-safe class is prohibited." *Id.*

Examining the class definition here, though, the Court does not find that the class is a fail-safe class. (*See* Compl., Doc. 1, ¶ 79.) The class includes Ohio citizens who received services from CRC, in a medical facility that contracts with their HIC, and who were then subject to attempts to collect or actual collection of medical bills from CRC or Frost-Arnett, not including deductibles or co-payments. (*Id.*) This definition, though, does not encompass all the elements of a violation of Ohio Revised Code § 1751.60. Unlike in *Kissling*, a patient who is found to be a class member is not also automatically successful on the claims, as that class member has still not shown that CRC had the insurance information, or that the class member suffered damages as a result of the attempted collection. Thus, the Court does not find that Named Plaintiffs' proposed class is a fail-safe class that warrants dismissal of the class allegations at this stage.

## CONCLUSION

Accordingly, the Court **ORDERS** the following:

1. Defendant CRC's Motion to Dismiss (Doc. 13) is **GRANTED IN PART AND**

**DENIED IN PART**;

2. Plaintiffs' claims for conversion and tortious interference are **DISMISSED**; and

3. Plaintiffs' remaining claims **SHALL PROCEED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND

28